21 Ill. App.3d 914 (1974)
316 N.E.2d 541
DAVID COUILLARD, Plaintiff-Appellant,
v.
ELGIN, JOLIET AND EASTERN RAILWAY COMPANY et al., Defendants-Appellants. B & L CARTAGE COMPANY, Plaintiff-Appellee,
v.
ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Defendant-Appellant.
No. 57485.
Illinois Appellate Court  First District (3rd Division).
August 1, 1974.
*915 *916 Hackbert, Rooks, Pitts, Fullagar and Poust, of Chicago, for appellants.
Epton, McCarthy and Druth, Ltd., of Chicago, for appellee B & L Cartage.
Berman and Newman, of Chicago, for appellee Couillard.
Judgments affirmed.
Mr. JUSTICE McGLOON delivered the opinion of the court:
This is an appeal from a consolidated personal injury and property damage action arising out of a collision between a diesel locomotive and an oil truck at U.S. Steel South Works in Chicago, Illinois. A jury trial in the circuit court of Cook County resulted in a verdict for David Couillard against the Elgin, Joliet and Eastern Railway Company and United States Steel Corporation, an a verdict for B & L Cartage Company against Elgin, Joliet and Eastern Railway Company. The trial court entered judgment on both verdicts.
Defendants present four issues for review. They contend that (1) plaintiff David Couillard was guilty of contributory negligence as a matter of law, (2) it was reversible error to refuse to submit defendants' instruction to the jury which would have permitted the jury to consider Couillard's alleged violation of a statute on the issue of his due care, (3) it was error to refer to defendants' failure to call a witness during argument and it was error to read answers from interrogatories during closing argument, (4) it was error for the trial court to exclude Couillard's testimony as to his customarily followed procedure in approaching and crossing railroad tracks.
We affirm.
B & L Cartage (B & L) filed a two-count complaint against the Elgin, Joliet and Eastern Railway Company (E.J. & E.) for property damage to its tractor-trailer. Count I alleged that the E.J. & E., while operating a locomotive, was negligent in failing to keep a proper lookout, proceeding at an excessive rate of speed, failing to maintain its brakes in proper working order, and failing to abide by a stop sign. Count II alleged that the E.J. & E. operated its locomotive in a wilful and wanton fashion. David Couillard, who was a truck driver employed by B & L Cartage company at the time, filed a two-count complaint against the E.J. & E. and United States Steel Corporation for personal injuries sustained in the collision. Count I alleged that the E.J. & E. was negligent in (1) operating its locomotive in a negligent manner, (2) failing to give any warning signals to Couillard, (3) failing to stop the locomotive when danger to *917 Couillard was imminent, and (4) failing to keep a proper lookout. Count II alleged that U.S. Steel was negligent in (1) ordering Couillard to stop with a portion of his vehicle on a railroad track, (2) failing to warn Couillard of the approaching locomotive, (3) failing to keep a lookout for the approaching locomotive, and (4) requiring entrants to U.S. Steel's premises to do certain acts which U.S. Steel knew or should have known would be dangerous to such persons. The complaints further alleged that defendants owed a duty to plaintiffs, that defendants' negligence was the proximate cause of plaintiffs' damages, and that plaintiffs were exercising due care.
At trial the following evidence was adduced. On the night of March 13, 1965, David Couillard was delivering a load of fuel oil to the U.S. Steel South Works plant. He was driving a semi-trailer rig, which was approximately 52 feet in length. Couillard had been employed by B & L Cartage as an oil truck driver for the 5 years preceding the accident. During this time he regularly delivered oil to the plant 3 nights a week.
As was his customary procedure, Couillard approached the plant traveling east on 86th Street, a public street that ended at the gate of the South Works plant. Couillard arrived at the plant at about 11:30 P.M. and stopped his rig at the gate opposite the guard shanty. While remaining in the rig he supplied some requested information to Ernest Black, the U.S. Steel plant guard. After obtaining the information, Black told Couillard, according to Couillard, "to pull up so he could get my trailer plates," which were at the rear of the trailer. Couillard drove his rig forward 40 to 45 feet and stopped with his semi-trailer straddling a railroad track. Couillard testified that as he was pulling the rig up he was looking into his left mirror to see when the end of his trailer came even with the guard shanty. While he was stopped he put his head out the left window and waited for the guard to come out. Couillard knew that he was straddling the track. After 20 or 30 seconds the rig was pushed over on its left side by a slow-moving switch engine which the E.J. & E. operated and which approached the rig from the right. The injuries complained of resulted from this collision.
The track upon which the engine approached ran parallel to 86th Street, an east-west street, and was a short distance south of it. (The rig was pointing east at the time of the collision.) A fence and some parked cars separated 86th Street from the track. At a point south of the entrance gate the track curved northerly, and at the point of the collision the track ran in a northeasterly direction.
Jay S. Merriman, an employee of the E.J. & E., operated the switch engine that was involved in the accident. Just before the accident the engine was moving forward. There were no railroad cars attached to it. *918 Merriman was sitting in the engineer's seat on the right side of the cab which was located to the rear of the engine. He testified that it was his duty to observe everything on the right of the engine. Merriman was watching a switchman who was walking on the right side of the train. Mr. Hardy, an employee of the E.J. & E., was sitting on the left side of the cab. Hardy was not called as a witness. Presumably he could have observed the tractor-trailer from his position in the cab.
Merriman testified that the locomotive was 300 feet away from the point of collision when it started to go forward. From the point at which the track started to curve in a northeasterly direction to the point of collision was about 45 feet. According to Merriman for the 5 minutes preceding the collision the train was continuously moving at a speed of less than 1 mile per hour. Seconds before the collision Hardy told Merriman that the trailer was on the tracks. When he received this warning he immediately applied the brakes and stopped the train within 1 or 2 feet.
The locomotive hit the trailer approximately one quarter of the way from the front. Couillard described the collision as a push or a nudge. Although the tank was not punctured, the oil did spill on the ground through a valve on the top of the trailer. Merriman testified that he did not feel the impact and did not know that he had hit the rig. According to his testimony, there were trucks stopped or going by, in the area 90 percent of the time.
The evidence showed that the artificial lighting in the area was fairly good. The headlight of the locomotive was on dim. The semi-trailer was 11 feet high and was illuminated with numerous multi-colored lights which were functioning properly. The testimony was in conflict as to when the bell was sounded. Couillard testified that he first heard the bell when the rig was going over. Merriman testified that he operated the bell continuously for the 25 feet preceding the collision, and that the bell was ringing for 2 or 3 minutes before the time Hardy told him to stop. According to Merriman's description the locomotive made a very loud noise.
The switching track where the collision occurred was not equipped with any warning apparatus and no flagman was present, although Couillard testified that on some previous occasions a flagman was present. Merriman testified that when he saw a train coming he would stop. However, on the night of the collision, neither before he crossed the track nor while he was straddling it did he look both ways for a train. He maintained that he could not see down the track to his right because it curved out of his sight.
The entire area inside the plant was paved. In addition to the track *919 on which the collision occurred, Couillard would necessarily have to cross 8 to 12 other sets of tracks depending on his destination within the plant. Some of these tracks had stop signs, flashers, or railroad crossing signs, presumably located in places where traffic would normally flow. However, there was no distinguishing marks on the pavement which delineated any roadways. A stop sign was located at a set of tracks, east of the point of collision. According to Couillard the sign was about 75 to 100 yards inside the gate. According to Black the guard the sign was 100 feet beyond the gatehouse.
Couillard testified that the guard gave instructions to him. He was fairly certain that the guard told him to pull up and wait. He was not certain that the guard used the word "stop." According to Black he told Couillard to proceed slowly so that he could get the license plate number off the trailer. At this time Black was speaking from inside the guard house. Black did not believe that he told Couillard to stop his truck. Between the time he told Couillard to proceed and the time he opened the door and saw the collision, Black may have been distracted with other duties. Black testified that when he opened the door he expected to merely step out to where he could see the plate on the rear of the trailer. If he missed the plate as the truck entered the plant, he would record it on the way out.
Defendants moved for a directed verdict at the close of plaintiffs' evidence and at the close of all the evidence. The trial court denied both motions. The court also refused to give a tendered instruction which would have allowed the jury to consider Couillard's alleged violation of section 84 of the Uniform Act Regulating Traffic on Highways (Ill. Rev. Stat. 1965, ch. 95 1/2, § 181) in determining whether Couillard was contributorily negligent. The trial court did instruct the jury, among other things, that U.S. Steel owed Couillard a duty to exercise ordinary care to keep its property reasonably safe for his use.
The jury returned a verdict for $8,511.12 in favor of B & L Cartage and against the E.J. & E. for damage to the tractor-trailer. It returned a verdict for $10,000 in favor of Couillard and against U.S. Steel and the E.J. & E. for his personal injuries. In a special interrogatory the jury found that Couillard was not guilty of any negligence which proximately caused any damage. The trial court entered judgments on the verdicts and denied defendants' posttrial motions.
Defendants' first contention is that Couillard was contributorily negligent as a matter of law and that, therefore, both plaintiffs should have been barred from recovery. Both cases went to the jury on the theory of ordinary negligence. At the close of all the evidence the trial court found *920 no evidence of wilful or wanton conduct and refused any instructions on that theory.
 1 Defendants argue that the trial court erred in denying their motion for a directed verdict at the close of all the evidence. Under the Pedrick rule (Pedrick v. Peoria & Eastern R.R. Co., 37 Ill.2d 494, 229 N.E.2d 504), a trial court should direct a verdict only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.
 2 In the instant case we find that the trial court properly refused to direct a verdict for defendants and properly let the issue of plaintiffs' due care go to the jury. In terms of plaintiffs' due care, the conduct which is expected from a reasonable man will vary according to the situation with which he is confronted. (Janjanin v. Indiana Harbor Belt R. Co., 343 Ill. App. 491, 99 N.E.2d 578.) The situation which confronted David Couillard is entirely different from those situations which confronted other plaintiffs in cited cases in which, on review, plaintiffs were found guilty of contributory negligence as a matter of law. Those cases involved collisions between trains and motor vehicles at crossings. Our reading of those cases persuades us that the reviewing courts barred recovery where a reasonable man should have known that he was in a perilous position vis-a-vis an approaching train but was negligent in the manner of crossing the tracks or in remaining on the tracks, for whatever reason he may have stopped on them.
In the instant case we have a very busy industrial plant with much traffic, both train and vehicular, proceeding in various directions. The circumstances call for a high degree of coordination between the employees of the plant and its suppliers. Couillard was familiar with the layout of the plant and its procedures. He knew that the guard wanted him to pull forward so that he could record his license plate number. While not absolutely essential, the guard usually recorded the number as the rig was going into the plant. After the guard told him to pull forward Couillard was looking out of his window and waiting for the guard to give him the "high sign." Sometimes the guard came out of the house; other times he did not.
 3, 4 In addition, Couillard's reasonable expectations about the operation of switch engines had some bearing on his standard of care. (See Stefan v. Elgin, Joliet & Eastern Ry. Co., 2 Ill. App.2d 300, 120 N.E.2d 52.) In the plant the locomotive was moving very slowly. The distance required to stop such an engine was relatively short. Many times men with lanterns warned traffic that trains were coming through; on this occasion there was no such warning. Furthermore, the evidence indicates *921 that the engineer did not sound the bell until it was too late. In conclusion, regardless of whether the guard told Couillard to stop, the question of his due care in waiting on the railroad track was properly left to the jury.
Defendants' second contention is that the trial court committed reversible error when it refused to submit an instruction which would have allowed the jury to consider Couillard's alleged violation of a statute on the issue of his due care. The basis of the trial court's refusal was his finding that the statute did not apply to the "crossing" involved in the instant case. The statute (Ill. Rev. Stat. 1965, ch. 95 1/2, § 181) required the driver of a vehicle carrying liquid petroleum products, before crossing any graded railroad track or tracks, to stop, listen, and look in both directions along such track for any approaching train.
Defendants argue that there was evidence in the record that Couillard violated this section and that this violation constituted evidence of contributory negligence. Plaintiffs maintain that this section does not apply to Couillard's crossing of the track on U.S. Steel premises. Defendants argue that the statute applies to all crossings, regardless of whether they are situated on public or private property.
 5 Our reading of the statute convinces us that plaintiffs' position is correct. Section 20 of the Act (Ill. Rev. Stat. 1965, ch. 95 1/2, § 117) provides:
"The provisions of this Act relating to the operation of vehicles refer exclusively to the operation of vehicles upon highways except:
1. Where a different place is specifically referred to in a given section.
2. The provisions of Articles IV and V shall apply upon highways and elsewhere throughout the State."
"Highway" is defined in section 12(a) (Ill. Rev. Stat. 1965, ch. 95 1/2, § 109(a)) as follows:
"Street or highway. The entire width between property lines of every way or place of whatever nature when any part thereof, is open to the use of the public, as a matter of right, for purposes of vehicular traffic * * *."
In the face of these provisions defendants reply that section 84 (Ill. Rev. Stat. 1965, ch. 95 1/2, § 181) specifically refers to a "different place" and should not be restricted to "highways" as defined in the Act. Defendants' position is without merit. Defendants further argue that it was the legislative intent that section 84 apply to the track involved in the instant case. The case of Noe v. Chicago Great Western Ry. Co., 71 Ill. App.2d 347, 219 N.E.2d 111, cert. denied, 402 U.S. 1009, is offered in support of *922 this argument. However, Noe is distinguishable. First, Noe involved an Iowa statute, which, while similar to section 84, did not, insofar as the opinion indicates, define its terms in the same manner as the Illinois statute. Second, Noe involved a collision between a train and a self-propelled crane at a railroad crossing on a private road which led from a gravel pit to a nearby highway. In the instant case we agree with the trial court's refusal to give a tendered instruction which was not justified by the evidence. See Gibson v. Healy Brothers & Co., 109 Ill. App.2d 342, 248 N.E.2d 771; Miller v. Vannier, 28 Ill. App.2d 258, 171 N.E.2d 405.
 6 Defendants' third contention has two related parts. First, they contend it was error on the part of opposing counsel to refer to defendants' failure to call certain witnesses during closing argument. Recognizing that under appropriate circumstances such comment is proper argument, defendants maintain that the persons referred to were available as witnesses to all parties and that therefore the reference was inappropriate. Defendants claim prejudice because the jury could have inferred that they were trying to conceal unfavorable testimony.
During closing argument counsel for B & L referred to the fact that plaintiffs, not defendants, called Mr. Merriman as a witness. Counsel for Couillard argued that the other members of the train crew, who were not in court, were the people who performed the negligent acts complained of. Counsel later reiterated this assertion. Defense counsel raised no objection to any of this line of argument.
Defense counsel replied in his closing argument over objection as follows:
"If there is any implication, any innuendo, that somehow we are hiding something in this case, I want to tell the jury that is not true. I want to tell the jury that we are required to bring in employees to the trial, any of our employees that either of the plaintiffs request that we bring in. We are required to bring them in, and they can question them, as they did with Mr. Merriman."
In rebuttal, counsel for B & L argued, as follows, with no objection from opposing counsel:
"Well, my God almighty, we have the burden to prove the case, but he certainly has got a duty to defend his clients, and if these three or four mysterious nobodys who were running that train aren't here and could have told us something to defend his client there was nothing stopping him from bringing them in. And they were the railroad employees at the time, and we went out and got one railroad employee. We brought him in."
Defendants raised this alleged error in their post-trial motions which the trial court denied. The complained-of argument may have been improper *923 in that there was nothing in the record to show that the three other members of the train crew were under the control of defendants at the time of trial or that plaintiffs could not have subpoenaed them. (Wofford v. DeVore, 73 Ill. App.2d 92, 218 N.E.2d 649.) The only testimony bearing on this issue was that of Mr. Merriman, who testified that Mr. Hardy, the man next to him in the cab of the locomotive, was no longer employed by the railroad. During argument defense counsel claimed that the three crew members no longer worked for the railroad.
 7 We do not find that this alleged improper argument prejudiced the rights of the defendants in the eyes of the jury. It was but a small portion of the entire argument. Certainly defense counsel's explanatory remarks to the jury would have had a curative effect on any error. Aside from that, the unfavorable inferences which the jury may have drawn related to the issue of defendants' negligence. In this appeal defendants have not argued that the finding that the defendants were negligent was against the manifest weight of the evidence. The evidence of defendants' negligence was substantial. Furthermore, no instruction was given on the subject of the absent witnesses, which could have compounded any error, as was done in Cicale v. Aronson, 113 Ill. App.2d 324, 252 N.E.2d 114. Under these circumstances any error in the argument was minimal and not reversible error.
The second part of defendants' third contention is that it was error to read answers to interrogatories during closing argument. This contention arises over defendants' two photographs of a portion of the U.S. Steel yard. Both photographs had been introduced into evidence at trial. During closing argument counsel for Couillard criticized the photographs because they were taken at an angle which made it difficult to perceive distances between important landmarks in the yard. Counsel implied that because it was private property plaintiffs could not gain access to take their own photographs. Defendants raised no objection to this portion of the argument.
Counsel for defendants responded to this argument by pointing out that discovery was available to plaintiffs so that they could have taken their own photographs. In rebuttal, counsel for Couillard read an answer from an interrogatory over objection. The answer stated that photographs of the area of the accident were taken on March 15, 1965 and were in the possession of defense counsel. Counsel for Couillard argued to the jury that plaintiffs relied on defendants to have "decent" photographs.
 8, 9 It appears that defendants' argument is directed to the impropriety of reading from interrogatories and to the prejudicial effect of the critical references to the photographs in evidence. It is proper argument for counsel to comment on the appearance of an exhibit. (Romine *924 v. Scott, 130 Ill. App.2d 649, 264 N.E.2d 537.) Defendants argue that opposing counsel's comments implied that they were attempting to hide something. We have examined the photographs and because of the angle at which they were taken they provide little help in illustrating the general layout of the yard near the gate, and they do not shed much light on our inquiry whether, if Couillard had pulled his truck up farther and had stopped at the stop sign, he would have still been straddling a railroad track. Considering the arguments of both counsel in the context of the entire argument to the jury, we find no prejudice which would require us to reverse the judgment.
 10, 11 Defendants' final contention is that the trial court erred in refusing to allow defendants to inquire into the habits of Couillard in crossing railroad tracks at the usual highway crossings. The intended purpose of this testimony was to show a deviation from his customary procedure on the night of the accident. The trial court refused to allow defense counsel to examine in this area. We find that the court's ruling was proper. Although testimony as to Couillard's habits in crossing railroad tracks at highway crossings may have had some relevance to whether he exercised due care in crossing the tracks on the U.S. Steel premises, even at a point where there was no designated railroad crossing, its admission might have tended to confuse the issue as to the care required in crossing the railroad track in the U.S. Steel yard. Whether certain useful evidence, which may have the danger of confusing the issues, should be admitted into evidence is left to the sound discretion of the trial court. (Veer v. Hagemann, 334 Ill. 23, 165 N.E. 175.) As no abuse has been shown, we will not disturb the trial court's ruling.
For the above reasons, the judgments of the circuit court of Cook County are affirmed.
Judgments affirmed.
McNAMARA, P.J., and DEMPSEY, J., concur.